NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-12708

JAMES M. RYAN, executor,[1,2]  vs.  MARY ANN MORSE HEALTHCARE CORP.[3]


Middlesex.     September 9, 2019. - December 5, 2019.

Present:  Gants, C.J., Lenk, Gaziano, Lowy, Budd, Cypher,
& Kafker, JJ.


Assisted Living Residence.  Landlord and Tenant, Security
     deposit.  Consumer Protection Act, Availability of remedy,
     Landlord and tenant.  Statute, Construction.



     Civil action commenced in the Superior Court Department on
August 24, 2016.

     A motion to dismiss was heard by Christopher K. Barry-
Smith, J.

     The Supreme Judicial Court on its own initiative
transferred the case from the Appeals Court.


     Joshua N. Garick (Matthew T. LaMothe also present) for the
plaintiff.
     AiVi Nguyen for the defendant.
     The following submitted briefs for amici curiae:

_____

     [1] Of the estate of Julia W. Ryan.

     [2] Individually and on behalf of all others similarly
situated.

     [3] Doing business as Heritage at Framingham.

Joseph M. Desmond & Justin L. Amos for Massachusetts Assisted Living Association.

Lillian Glickman, pro se.

Elizabeth A. Aniskevich & Susan A. Silverstein, of the District of Columbia, Richard M.W. Bauer, Liane Zeitz, & Rebecca J. Benson for AARP & others.

KAFKER, J.  At issue in this case is the extent to which Massachusetts assisted living residences (ALRs) are subject to the strictures of the security deposit statute, G. L. c. 186, § 15B.  The defendant operates an ALR in Framingham that charges new residents an upfront "community fee," in addition to the first month's rent and the last month's rent permitted by G. L. c. 186, § 15B.  The community fee was intended to cover upfront administrative costs, an initial service coordination plan, move-in assistance, and a replacement reserve for building improvements.  The plaintiff alleges that the community fee violates G. L. c. 186, § 15B, as it exceeded the upfront costs allowed by the security deposit statute.  The defendant moved to dismiss the suit, arguing that ALRs are not subject to G. L. c. 186, § 15B.  The motion to dismiss was granted, and the plaintiff appealed.

We conclude that G. L. c. 19D, the ALR statute, incorporates applicable consumer protection laws, including G. L. c. 186, § 15B, but allows for additional upfront charges for the distinctive services assisted living facilities provide that are not applicable to traditional landlord-tenant

relationships.  Indeed, the ALR statute and corresponding regulations expressly provide for the payment of particular fees related to initial assessments of residents to determine their suitability for placement in an assisted living facility.  Such services and fees have no applicability to the traditional landlord-tenant relationship, and are thus not subject to the security deposit law.  Accordingly, ALRs may institute upfront charges beyond those permitted by G. L. c. 186, § 15B (1) (b), to the extent that such charges correspond to the distinct services enumerated in G. L. c. 19D, § 13, or to other services designed specifically for assisted living residences.  If, however, an ALR charges upfront fees that are not used to fund such distinct assisted living services, it does so in violation of § 15B.

In the instant case, further factual development is required to determine whether the fee at issue was permissibly charged and used for services distinct to ALRs, and thus the motion to dismiss was not properly allowed.  One or more components of the defendant's community fee appear to have been charged for initial assessments mandated by the ALR statute.  Such a service and fee would be specific to assisted living facilities and not governed by the security deposit statute.  However, further clarification and factual development as to the purpose and use of other components of the community fee is

required, particularly for the replacement reserve fee for building improvements.  We cannot discern on this record whether each component of the community fee was imposed and used for services distinct to assisted living facilities but inapplicable to the traditional landlord-tenant relationship.  We therefore reverse the decision allowing the motion to dismiss and remand the case to the Superior Court for further proceedings consistent with our decision.[4]

1.  Background.  a.  Facts.  We review the allowance of a motion to dismiss de novo, accepting as true all well-pleaded facts alleged in the complaint.  See Calixto v. Coughlin, 481 Mass. 157, 158 (2018).  We summarize the factual allegations as set forth in the complaint and the residency agreement referenced by both parties.[5]  See Marram v. Kobrick Offshore Fund, Ltd., 442 Mass. 43, 45 & n.4 (2004).

---

[4] We acknowledge the amicus briefs submitted by the Massachusetts Assisted Living Association, by Lillian Glickman, and by AARP, AARP Foundation, the National Consumer Law Center and the National Academy of Elder Law Attorneys.

[5] The residency agreement into which Julia Ryan entered with the defendant was not attached to the plaintiff's complaint. Rather, the agreement was first submitted as an exhibit to the defendant's memorandum in support of its motion to dismiss. Despite this, the complaint makes clear reference to the agreement.  Indeed, both parties rely on the terms of the agreement in support of their briefing, and neither party disputes the existence or terms of the agreement.  Thus, in light of the importance of this document, and the fact that it is not in dispute, this court may properly consider it in

In 2013, Julia Ryan entered into an agreement with Mary Ann Morse Healthcare Corp., doing business as Heritage at Framingham (Heritage), to lease an apartment in the defendant's ALR in Framingham. The agreement, titled "Residency Agreement," provided that Heritage "hereby leases to the Resident" an apartment at the Framingham facility.

Ryan's rent was $4,000 per month. Prior to the commencement of Ryan's residency, Heritage required her to pay the first and last month's rent. In addition to the first and last month's rent, Heritage also charged Ryan a nonrefundable, one-time "community fee" of $2,800. According to the residency agreement, the community fee was "intended to cover upfront staff administrative costs, the Resident's initial service coordination plan and move-in assistance, and establish a replacement reserve for building improvements." The agreement also provided that "the Community is required to pay interest to

_____

connection with the complaint. See Marram v. Kobrick Offshore Fund, Ltd., 442 Mass. 43, 45 n.4 (2004) (because "the plaintiff had notice of these documents and relied on them in framing the complaint, the attachment of such documents to a motion to dismiss does not convert the motion to one for summary judgment, as required by Mass. R. Civ. P. 12 [b] [6], 365 Mass. 754 [1974]"). See also Berkowitz v. President & Fellows of Harvard College, 58 Mass. App. Ct. 262, 270 n.7 (2003).

the Resident annually in keeping with the Landlord/Tenant Law Chapter 186, Section 151B(2)(a)."[6]

In 2016, James Ryan, the executor of Julia Ryan's estate, commenced this putative class action, alleging that Heritage violated G. L. c. 186, § 15B, and G. L. c. 93A by charging new residents the community fee. Heritage moved to dismiss the plaintiff's complaint, claiming that, as an ALR, it was not subject to the security deposit statute. On March 5, 2018, a judge in the Superior Court granted the motion, concluding that the Legislature did not intend for ALRs to be subject to the security deposit statute. The plaintiff appealed.

In May 2017, while the motion to dismiss was still pending, a different judge in the Superior Court concluded that the security deposit statute did apply to ALRs. See Gowen vs. Benchmark Senior Living LLC, Mass. Super. Ct., No. 1684CV03972-BLS2 (Suffolk County May 9, 2017). The Gowen decision recognized, however, a possible exception to the fee restrictions imposed by G. L. c. 186, § 15B, in the context of ALRs, stating:

> "The statutory limitation on fees imposed by residential landlords only governs fees charged for a 'tenancy.' To the extent that [the defendant] or another assisted living facility operator provides its residents with services that

---

[6] The reference to "151B(2)(a)" in the residency agreement appears to be a typographical error. As discussed infra, the pertinent section pertaining to a landlord's handling of the last month's rent is G. L. c. 186, § 15B (2) (a).

are beyond the scope of a typical residential tenancy, it
is entitled to charge for those services and may do so
without running afoul of § 15B."  (Citation omitted.)

Id. at 3-4.  The judge went on to conclude, however, that the
plaintiff had plausibly alleged facts suggesting that the
community fee "was assessed at least in part as a charge for her
residential tenancy, and not for separate activities or
services."  Id. at 4.  That judge reached a similar conclusion
again in another case in August 2018.  See Hennessy vs.
Brookdale Senior Living Communities, Inc., Mass. Super. Ct., No.
1784CV04215-BLS2 (Suffolk County Aug. 1, 2018).  In light of the
conflicting reasoning and outcomes on this issue by judges in
the Superior Court, we transferred the plaintiff's appeal to
this court on our own motion.

b.  Relevant statutes.  i.  The security deposit statute.
The Legislature enacted the security deposit statute "as part of
an elaborate scheme of rights and duties to prevent abuses and
to insure fairness to the tenant."  Meikle v. Nurse, 474 Mass.
207, 212 (2016).  "In passing the [security deposit statute],
the Legislature recognized that tenants have less bargaining
power than landlords and are less able to vindicate their rights
in court."  Phillips v. Equity Residential Mgt., L.L.C., 478
Mass. 251, 254 (2017).  See Mellor v. Berman, 390 Mass. 275, 282
(1983) (explaining that § 15B manifests Legislature's "concern
for the welfare of tenants in residential property who, as a

practical matter, are generally in inferior bargaining positions and find traditional avenues of redress relatively useless"). Accordingly, § 15B "protects tenants by providing clear guidelines for landlords to follow with regard to handling security deposits."  Phillips, supra.

Section 15B provides, inter alia, that "[a]t or prior to the commencement of any tenancy, no lessor may require a tenant or prospective tenant to pay any amount in excess of" four enumerated charges.  G. L. c. 186, § 15B (2) (b).  Specifically, lessors are limited to charging the first month's rent, the last month's rent, a security deposit equal to the first month's rent, and the purchase and installation cost for a key and lock. Id.  Charging any amount in excess of those four permissible fees is considered an unfair or deceptive practice in violation of G. L. c. 93A.  See 940 Code Mass. Regs. § 3.17(4)(a) (1993).

To the extent that a landlord charges a permissible upfront fee, § 15B also imposes specific requirements as to the handling of those fees.  If a landlord chooses to require a security deposit, the landlord must hold the deposit in a "separate, interest-bearing account in a bank, located within the commonwealth under such terms as will place such deposit beyond the claim of creditors of the lessor."  G. L. c. 186, § 15B (3) (a).  If a landlord chooses to require the last month's rent upfront, the landlord must "pay interest at the

rate of five per cent per year or other such lesser amount of interest as has been received from the bank where the deposit has been held." G. L. c. 186, § 15B (2) (a). The landlord must also provide the tenant with yearly receipts as to the amount of interest payable on the last month's rent. See id. The failure to comport with these requirements may entitle a tenant to recover treble damages against his or her landlord. See id.; G. L. c. 186, § 15B (7).

Section 15B also provides additional protections for tenants beyond the mere regulation of fees. Landlords must furnish new tenants with a statement of the condition of the premises and adhere to strict record-keeping requirements upon withholding any portion of the tenant's security deposit after the termination of the tenancy. Further, pursuant to G. L. c. 186, § 15B (1) (a), a landlord may only enter the premises "to inspect the premises, to make repairs thereto or to show the same to a prospective tenant, purchaser, mortgagee or its agents," to survey damage to the premises from an outgoing tenant, or in accordance with a court order or if the premises appear to have been abandoned.

Although the security deposit statute does not explicitly define the scope of its applicability, "the elaborately drafted text of the section indicates by repeated references that the draftsmen were thinking in terms of residential applicability."

Shwachman v. Khoroshansky, 15 Mass. App. Ct. 1002, 1002 (1983).

See Norfolk & Dedham Mut. Fire Ins. Co. v. Morrison, 456 Mass.

463, 468-469 (2010) (acknowledging that G. L. c. 186, § 15B,

applies to residential, rather than commercial, leases).

ii. The ALR statute. Decades after the enactment of the

security deposit statute, the Legislature enacted G. L. c. 19D,

which regulates ALRs. See St. 1994, c. 354. That statute

defines ALRs as entities that (1) provide room and board; (2)

provide "assistance with activities of daily living for three or

more adult residents who are not related by consanguinity or

affinity to their care provider"; and (3) "collect[] payments or

third party reimbursements from or on behalf of residents to pay

for the provision of assistance with the activities of daily

living or arranges for the same." G. L. c. 19D, § 1. Examples

of the types of assistance that residents may receive include

assistance with bathing, dressing, grooming, ambulation, and

other similar tasks. See G. L. c. 19D, §§ 1, 10.

In order to provide these services, ALRs develop a "service

plan" with each resident and document the provision of services

in accordance with the plan using written progress reports.

G. L. c. 19D, § 2 (v), (vi), (vii). These individualized plans

must describe "the needs of the resident for personal services

and the providers, or intended providers thereof, and the

frequency and duration of such services." G. L. c. 19D, § 12.

ALRs must also provide residents with opportunities to socialize, access to community resources, regular meals, housekeeping, self-administered medication management, and laundry services.  G. L. c. 19D, § 10 (a).  Further, ALRs must have a system in place to respond to emergency resident needs. G. L. c. 19D, § 10 (a) (6).  ALRs may also choose to provide residents with additional amenities, such as local transportation and barber and beauty services.  See G. L. c. 19D, § 10 (b).

Because the suitability of a resident's placement in an ALR turns on whether the ALR can adequately accommodate the resident's needs, ALRs conduct an initial screening and assessment of each resident before he or she moves in.  See 651 Code Mass. Regs. § 12.04(6) (2017).  The screening and assessment evaluate the prospective resident's service needs and preferences, as well as the ALR's ability to meet those needs. Id.  Each resident's service plan must be developed before the resident moves into the facility.  See 651 Code Mass. Regs. § 12.04(7) (2017).

Within the realm of elderly housing options, ALRs fall within a "spectrum of living alternatives for the elderly in the commonwealth."  St. 1994, c. 354, § 1.  ALR facilities provide elderly residents with services well beyond what would be available at a regular apartment complex, but short of the care

and supervision at a nursing home. See id. Unlike regular apartment complexes, ALRs not only provide elderly residents with private living quarters but, as discussed supra, also furnish personal services to assist residents with daily tasks. See G. L. c. 19D, §§ 1, 10, 16. "In support of the goal of aging in place, the services available . . . are added, increased or adjusted to compensate for the physical or cognitive impairment of the individual while maximizing the individual's dignity and independence." St. 1994, c. 354, § 1. However, ALRs are not operated or regulated as medical or nursing facilities, and do not provide the level of extensive medical care available from those facilities. See id.; G. L. c. 19D, § 18 (a). Accordingly, individuals who require twenty-four hour skilled nursing care may not reside in an ALR. See G. L. c. 19D, § 11. Indeed, ALRs may not house residents who require any skilled nursing care, unless the care falls within narrow limitations.[7] See id. See also G. L. c. 19D, § 18 (a)

---

[7] Specifically, ALRs may only house residents who require skilled nursing care if all of the following conditions are met:

"1. The care will be provided by a home health agency certified under Title XVIII of the Social Security Act, 49 Stat. 620 (1935), 42 U.S.C. [§§] 301, as amended or an entity licensed under [G. L. c. 111], on a part-time, intermittent basis for not more than a total of ninety days in any twelve-month period, or by a licensed hospice.

(exempting ALRs from statutes applicable to nursing homes and hospitals). Thus, ALRs serve individuals who suffer from some cognitive or physical limitations that require additional assistance with daily tasks, but who do not need extensive medical care and wish to remain in a residential setting.

As a prerequisite to operating in the Commonwealth, ALRs must apply for, and obtain, certification from the Executive Office of Elder Affairs (EOEA). See G. L. c. 19D, §§ 3, 4. Applications for certification require ALRs to disclose an operating plan for the facility. See G. L. c. 19D, § 4. ALRs must also report whether the facility is "in sound fiscal condition" with "sufficient cash flow and reserves" to meet the needs of their residents' service plans. See id. An ALR's failure to maintain its certification will subject the operator of the facility to civil liability. See G. L. c. 19D, § 8. In order to receive or renew its certification, an ALR must submit to a compliance review of the premises at least once every two years. See 651 Code Mass. Regs. § 12.09 (2017). ALRs must also meet minimum management and staffing qualifications and adhere

---

"2. The certified home health agency, entity licensed under [G. L. c. 111], or hospice does not train [ALR] staff to provide the skilled nursing care.

"3. The individual to whom the skilled nursing care is provided is suffering from a short-term illness."

G. L. c. 19D, § 11.

to certain staff training requirements.  G. L. c. 19D, § 2 (ix); 651 Code Mass. Regs. §§ 12.06, 12.07 (2017).

To handle possible compliance issues, the ALR statutory and regulatory scheme provides for a Statewide ombudsman program that receives, investigates, and resolves resident complaints. See G. L. c. 19D, § 7; 651 Code Mass. Regs. § 13.09 (1995).  The ALR statute also provides an enumerated list of eighteen resident rights, including the right to "not be evicted from the [ALR] except in accordance with the provisions of landlord tenant law as established by [G. L. c. 186] or [G. L. c. 239]." G. L. c. 19D, § 9 (18).  The ALR statute does not, however, include a private right of action.

2.  Discussion.  The issue presented in this case is whether the restrictions on initial residential lease fees contained within G. L. c. 186, § 15B, apply to ALRs certified pursuant to the ALR statute.  More broadly, it raises the issue whether and to what extent the ALR statute incorporates additional protections for residents that are not enumerated within the ALR statute itself.  Heritage characterizes the ALR statute as largely a stand-alone regulatory scheme addressing a distinct residential arrangement.  The plaintiff, by contrast, asserts that the ALR statute incorporates consumer protection laws, including the security deposit law, and ALRs fall well within the scope of the landlord-tenant relationships governed

by such laws.  The question is not an easy one.  The statute is a complex combination of stand-alone provisions and cross-references to other "applicable" laws.  Whether a statute is "applicable" in whole, in part, or not at all is not always clear.  Two different Superior Court judges in three separate cases carefully considered the question and reached opposite conclusions as to the applicability of the security deposit statute to ALRs.  We conclude that the ALR statute incorporates applicable consumer protection laws, including G. L. c. 186, § 15B, but allows for additional upfront charges for the distinctive services ALR facilities provide that are not applicable to traditional landlord-tenant relationships.

a.  Standard of review.  We interpret statutes in accordance with the intent of the Legislature.  See Meyer v. Veolia Energy N. Am., 482 Mass. 208, 211 (2019).  "Ordinarily, where the language of a statute is plain and unambiguous, it is conclusive as to legislative intent" (citation omitted).  Ciani v. MacGrath, 481 Mass. 174, 178 (2019).  Where the statutory language is ambiguous or unclear, however, our task is more complicated.  "Where the words of the statute are ambiguous, we strive to make it an effectual piece of legislation in harmony with common sense and sound reason and consistent with legislative intent" (quotation and citation omitted).  Commonwealth v. Pon, 469 Mass. 296, 302 (2014).  We must also

take into account the interrelationship of different statutes. "In the absence of explicit legislative commands to the contrary, we construe statutes to harmonize and not to undercut each other." School Comm. of Newton v. Newton Sch. Custodians Ass'n, Local 454, SEIU, 438 Mass. 739, 751 (2003).

b. Ambiguity of the ALR statute. The extent to which the Legislature intended to provide ALR residents with the protections afforded by other statutes is not readily apparent from the plain language of the ALR statute. The statute repeatedly makes reference to the fact that ALRs are subject to other "applicable" laws and regulations. For example, G. L. c. 19D, § 16, requires ALRs to "meet the requirements of all applicable federal and state laws and regulations, including, but not limited to, the state sanitary code, state building and fire safety codes and regulations, and laws and regulations governing handicapped accessibility."[8] Additionally, ALRs are

---

[8] The ALR statute further provides that, "[i]n order to facilitate compliance with these laws and regulations, the [Executive Office of Elder Affairs (EOEA)], in consultation with the department of housing and community development and the executive office of public safety, shall compile and make available a list of all such applicable laws and regulations." G. L. c. 19D, § 16. The EOEA does not appear to have compiled such a list. Rather, the corresponding regulations parrot the same language found in the statute. See 651 Code Mass. Regs. § 12.04(1)(e) (2017) ("Every [ALR] shall meet the requirements, of all applicable federal and state laws and regulations including, but not limited to, the state sanitary codes, state building and fire safety codes and laws and regulations governing use and access by persons with disabilities").

required to enter into a written residency agreement with each resident that includes a "covenant to comply with applicable federal and state laws and regulations regarding consumer protection and protection from abuse, neglect and financial exploitation of the elderly and disabled."  G. L. c. 19D, § 14. Despite these references, the ALR statute does not identify which laws or regulations regarding consumer protection and protection from abuse, neglect, and financial exploitation of the elderly and disabled are "applicable" to ALRs.  Nor does the statute expressly address whether G. L. c. 186, § 15B, is applicable.  There is only one reference to G. L. c. 186 -- the ALR statute provides that tenants may be evicted only in accordance with G. L. c. 186 and G. L. c. 239.  See G. L. c. 19D, § 9 (18).

Each party urges us to draw inferences selectively from the ALR statute's ambiguity.  The plaintiff relies on the language in the ALR statute generally incorporating applicable consumer protection laws.  The plaintiff also relies on the failure to include the security deposit statute in a list of laws referenced in the ALR statute as being inapplicable.[9]  The

---

[9] The statute explicitly states that ALRs "shall not be subject to the provisions of" G. L. c. 1ll, §§ 25B-25H, 51, 70E-73B, or G. L. c. 40A, § 9, seventh par.  G. L. c. 19D, § 18 (a). These laws primarily pertain to the statutory schemes governing

defendant contends that the Legislature's explicit reference to G. L. c. 186 with regard to evictions implies that the Legislature did not intend for G. L. c. 186 to otherwise apply.[10] Neither proffered explanation is wholly satisfactory, as each relies on selective readings of the statutory language.

c. Harmonizing the ALR statute with preexisting law. To resolve the ambiguity, we look at the statute holistically to determine its intent. See Casseus v. Eastern Bus Co., 478 Mass. 786, 795 (2018). See also Adams v. Boston, 461 Mass. 602, 613 (2012) (employing maxim that "[s]eemingly contradictory provisions of a statute must be harmonized so that the enactment as a whole can effectuate the presumed intent of the Legislature" [citation omitted]). We also recognize that, whenever possible, "a statute is to be interpreted in harmony with prior enactments to give rise to a consistent body of law."

---

hospitals, nursing homes, and other long-term care facilities. See 651 Code Mass. Regs. § 12.14 (2017).

[10] We also note that it is not immediately clear which portions of G. L. c. 186 are implicated by the ALR statute's reference to eviction proceedings. For example, eviction actions under G. L. c. 186 may implicate G. L. c. 186, § 15B, to the extent such evictions involve impermissible penalties, see Commonwealth v. Chatham Dev. Co., 49 Mass. App. Ct. 525, 527-528 (2000), or the failure to return a security deposit posteviction, see Vinton v. Demetrion, 19 Mass. App. Ct. 948, 949 (1985). Further, we have held that a violation of the security deposit statute may be asserted as a defense to a summary process action for possession under G. L. c. 239. See Meikle v. Nurse, 474 Mass. 207, 213-214 (2016).

Jancey v. School Comm. of Everett, 421 Mass. 482, 496 (1995).

See County Comm'rs of Middlesex County v. Superior Court, 371

Mass. 456, 460 (1976) ("Statutes which do not necessarily

conflict should be construed to have consistent directives so

that both may be given effect").  "Where two statutes appear to

be in conflict, . . . we 'endeavor to harmonize the two statutes

so that the policies underlying both may be honored.'"  George

v. National Water Main Cleaning Co., 477 Mass. 371, 378 (2017),

quoting Commonwealth v. Harris, 443 Mass. 714, 725 (2005).  We

conclude that when the two statutes at issue here are read

holistically, they can be harmonized as follows:  the security

deposit law was meant to be incorporated by the ALR statute to

the extent that it is applicable to ALRs, but ALRs may also

charge additional upfront fees for the distinct services that

such facilities provide that are not applicable to ordinary

landlord-tenant relationships.

     We begin with the express statutory language of the ALR

statute.  In so doing, we presume that the Legislature enacted

the ALR statute with full knowledge of the security deposit

statute that preceded it.  Alliance to Protect Nantucket Sound,

Inc. v. Energy Facilities Siting Bd., 457 Mass. 663, 673 (2010).

The ALR statute requires ALRs to include a provision within

their residency agreements "to comply with applicable federal

and state laws and regulations regarding consumer protection and

protection from abuse, neglect and financial exploitation of the elderly and disabled." G. L. c. 19D, § 14. We conclude that the security deposit statute, G. L. c. 186, § 15B, is an "applicable" consumer protection law, at least to the extent that ALRs resemble a traditional landlord-tenant relationship. As we have previously recognized, tenant protections are firmly rooted within the Commonwealth's consumer protection laws. See Humphrey v. Byron, 447 Mass. 322, 327 (2006) ("modern notions of consumer protection have played a role in the development of the law regarding residential leases" [quotation and citation omitted]). This is so because residential tenants generally inhabit an inferior bargaining position relative to their landlords, and the Legislature has enacted laws such as the security deposit statute out of concern for their welfare. See Mellor, 390 Mass. at 282. Such protections are particularly significant for elderly tenants, who are among the most needy and vulnerable segments of our population. See Lowell Hous. Auth. v. Melendez, 449 Mass. 34, 40 (2007). They are greatly dependent upon, and benefited by, such laws. If the security deposit statute were not applicable to ALRs, ALR residents would be in a worse position than other elderly residents living in their own apartments. They would also be without the extensive regulatory protections that inure to nursing home residents. We

discern no intention by the Legislature to leave this particular group of elderly residents unprotected relative to their peers.

The implication of such tenant protections within the ALR context also comports with the significant similarities between ALR residencies and residential tenancies. An ALR must enter into a written residency agreement with each resident that is akin to a lease; the residency agreement sets forth the rights and responsibilities of both the resident and the entity that runs the ALR. See G. L. c. 19D, § 14. The agreement must also specify "the conditions under which the agreement may be terminated by either party," as well as "reasonable rules for conduct and behavior." Id. Additionally, each resident's unit must include amenities traditionally found in an apartment, such as lockable doors, private bathrooms, and kitchenettes or access to kitchen amenities. See G. L. c. 19D, § 16. See also 651 Code Mass. Regs. § 12.04(1) (2017). Moreover, ALR residents are entitled to protections resembling the warranties of habitability and quiet enjoyment provided to residential tenants. See G. L. c. 19D, § 9 (1), (3). These components of the ALR statute reflect the Legislature's intent to ensure that such facilities constitute a suitable residential environment.[11]

---

[11] Notably, the Legislature repeatedly made reference to the residential nature of ALRs in articulating the purpose of the ALR statute:

Indeed, the Legislature explicitly states that ALRs "should be operated and regulated as residential environments with supportive services and not as medical or nursing facilities." St. 1994, c. 354, § 1.

In sum, we conclude that the security deposit statute is a consumer protection law applicable to ALRs to the extent that ALRs resemble an ordinary landlord-tenant relationship. This is, however, not the end of our analysis. We must now consider the services that ALR facilities provide that are <u>not</u> applicable to ordinary landlord-tenant relationships, and determine whether ALR facilities may impose upfront fees for such services. We conclude that they may.

d. <u>The inapplicability of security deposit statute to distinct ALR services</u>. In analyzing the applicability or inapplicability of the security deposit statute, in part or in

---

"to promote the availability of services for elderly or disabled persons in a <u>residential</u> environment; to encourage the development of <u>residential</u> alternatives that promote the dignity, individuality, privacy and decision-making ability of such persons; to provide for the health, safety, and welfare of residents in [ALRs]; to promote continued improvement of such <u>residential</u> alternatives; to encourage the development of innovative and affordable <u>residential</u> alternatives for such persons; and to encourage the provision of economic, social and health services to residents through such <u>residential</u> alternatives by sponsors of [ALRs] and community agencies" (emphases added).

St. 1994, c. 354, § 1.

whole, we must also examine the differences between ALRs and traditional landlord-tenant relationships.  We conclude that the important differences between these relationships, in combination with express language in the ALR statute allowing for particular charges, permit the imposition of fees for the distinct services ALRs provide, and that doing so does not constitute a violation of the security deposit statute.

Here we focus on substance, not semantics.  To be sure, the ALR statute uses terms different from the traditional language of tenancy, employing the term "resident" rather than "tenant" and "residency agreement" rather than "lease."  G. L. c. 19D, § 1.  More important, however, are the significant substantive differences between an ALR and a regular residential landlord.  Chief among these is the ALR's obligation to provide multiple services to elderly residents needing assistance with activities of daily living, apart from mere possession of a rental unit.  See APT Asset Mgt., Inc. v. Board of Appeals of Melrose, 50 Mass. App. Ct. 133, 143 (2000) ("Landlords do not customarily provide their tenants with most of these [ALR] services nor are they required by law to do so").[12]

---

[12] The ALR statute's definition of "elderly housing" elucidates this distinction.  Elderly housing, which falls outside the statute's purview, is defined as "any residential premises available for lease by elderly or disabled individuals which is financed or subsidized in whole or in part by state or

Indeed, while normal residential leaseholds do not contemplate, and certainly do not mandate, the provision of elderly assistance services, ALR residencies are premised upon them. The provision of elderly assistance services is the means by which the Legislature contemplated that ALRs would allow the elderly to "age in place" in a residential setting, without prematurely moving to a nursing home. See St. 1994, c. 354, § 1. By providing elderly residents with services that "compensate for the physical or cognitive impairment of the individual," ALRs ensure that the elderly can receive adequate assistance with daily tasks "while maximizing [their] dignity and independence." Id. These services are thus mandated by law. They are, as explained supra, the sine qua non of ALRs.[13]

Because the provision of services is at the core of what an ALR does for its residents, it is crucial that the services be tailored for each individual resident, and that the ALR have the

_____

federal housing programs established primarily to furnish housing rather than housing and personal services" (emphasis added). G. L. c. 19D, § 1. This definition makes clear that the primary difference between ALRs and age-restricted housing turns on the provision of personal services.

[13] Even to the extent that a residential lease includes the provision of certain services to a tenant, such as those provided in a luxury apartment complex, they are distinguishable from the services furnished by ALRs. While luxury apartment complexes may choose to provide additional amenities to tenants at their own discretion, ALRs are mandated by law to provide specific elderly assistance services tailored to the needs of their residents.

ability to appropriately furnish such services. An ALR would not be able to adequately "provide for the health, safety, and welfare" of residents in accordance with the ALR statute's purpose if it admitted an individual that the ALR was ill equipped to care for. See St. 1994, c. 354, § 1. Moreover, the ALR statute requires that ALRs formulate individualized service plans for each of their residents, and the regulations specify that such plans are to be developed before the resident moves in. See G. L. c. 19D, § 12 (a); 651 Code Mass. Regs. § 12.04(7). Thus, a prospective ALR resident must also undergo an initial screening and assessment to determine whether the ALR is adequately suited to the prospective resident's particular needs. See 651 Code Mass. Regs. § 12.04(6). This constitutes one of the other most significant distinctions between ALR residencies and residential leases and has specific implications for the applicability of the security deposit statute. Regular residential landlords are not mandated by statute or regulation to conduct the kind of assessment that ALRs are so mandated to conduct. Thus, while landlords are strictly prohibited from imposing upfront charges that exceed those specifically enumerated in the security deposit statute, such a prohibition is incongruous in the context of an ALR, which is mandated to spend additional resources on initial resident assessments.

In recognition of this mandate, the ALR statute explicitly contemplates that ALRs may charge privately paying residents for such initial assessments.  Pursuant to G. L. c. 19D, § 13, residents eligible for financial assistance under G. L. c. 118E, which governs MassHealth, are entitled access to preadmission screening procedures and assessments.[14]  Section 13 provides in pertinent part:

> "All elderly residents or residents with special needs who seek admission to an [ALR] and who are eligible for the medical assistance program under [G. L. c. 118E], shall:
>
> "1.  Be afforded the opportunity to apply for [ALR] services, and be informed about the eligibility requirements and his or her rights and obligations under the program.
>
> "2.  Have an initial pre-screening assessment conducted for the purposes of determining eligibility for and need of assisted living services.  Such assessment shall consider the appropriateness of assisted living services for said resident, and other community-based alternatives that are appropriate and available.
>
> "3.  Have a service plan monitoring assessment conducted by an assessor at the site of the [ALR] resident annually from the date of initial occupancy.  Said monitoring assessment shall determine if the services provided to the resident are meeting his or her needs as determined in the service plan, the assessor shall report any instances of resident abuse or neglect pursuant to [G. L. c. 19A, § 15,] and [G. L. c. 111, § 72G]."

---

[14] For ALR residents who receive financial assistance under G. L. c. 118E, the ALR statute specifies that such service plans are to be "developed in consultation with the pre-screening assessor as set forth in [G. L. c. 19D, § 13]."  G. L. c. 19D, § 12 (a).

G. L. c. 19D, § 13. Crucially, while this provision focuses on the rights of residents who receive financial assistance, it also states that privately paying residents "may be offered the services specified in said subparagraphs 1 to 3, inclusive, on a fee for service basis."[15] Id. Thus, by its very terms, the ALR statute permits ALRs to charge privately paying residents for initial prescreening assessments on a "fee for service basis." In interpreting this provision, "[w]e presume that the Legislature acts with full knowledge of existing laws." Alliance to Protect Nantucket Sound, Inc., 457 Mass. at 673. At the time of the ALR statute's passage in 1994, the security deposit statute had been in effect in its present form for nearly twenty years and was a mainstay of modern landlord-tenant law in the Commonwealth. Accordingly, because the ALR statute, passed after the security deposit statute, explicitly permits upfront charges that pertain to initial resident assessments,

---

[15] The overwhelming majority of individuals residing in ALRs appear to be privately paying residents. According to the Massachusetts Assisted Living Association, approximately ninety percent of ALR residents in Massachusetts pay privately. Mass-ALA, Massachusetts Assisted Living Resource Guide 3 (2019). In 2018, only 2.9% of ALR residents were enrolled in Group Adult Foster Care, a benefit program provided by MassHealth that assists with personal care services and medication management expenses. Executive Office of Elder Affairs, Assisted Living Residence Certification Program: Resident Aggregate Information Annual Report 3 (2018), https://www.mass.gov/files/documents/2019/10/11/ALR%20Annual%20Distribution%20Report%20Summary%20-%20CY2018%20%20%2010.8.19.pdf [https://perma.cc/RQW7-BS5H].

while the security deposit statute does not, we conclude that the Legislature intended for such charges to be permissible.[16]

This interpretation of the ALR statute is further bolstered by the corresponding ALR regulations. In apparent recognition of the fee for service provision in G. L. c. 19D, § 13, the EOEA promulgated regulations that acknowledge that ALR residents may be charged an "administrative fee" in connection with their admission. See 651 Code Mass. Regs. § 12.02 (2017).[17] The

---

[16] Other sections within the ALR statute similarly clarify how an ALR resident's rights under the security deposit statute are modified by the ALR's provision of services. For example, while the security deposit statute strictly curtails a landlord's ability to enter a residential tenant's premises, see G. L. c. 186, § 15B (1) (a), the ALR statute provides that residents have a right to privacy within their living unit "subject to rules of the [ALR] reasonably designed to promote the health, safety and welfare of residents." G. L. c. 19D, § 9 (3). This provision indicates that while an ALR resident has a right to privacy, this right may be subject to ALR-specific exceptions, such as the need to enter a resident's living unit to provide daily services, to assist in an emergency, or to supervise access to kitchen amenities. See 651 Code Mass. Regs. § 12.04(1)(a) (2017) ("Residents shall have exclusive rights to their Units . . . . [H]owever, as part of a Resident's Service Plan, keys or access codes may be readily available to specified shift staff").

[17] The statute applicable to continuing care retirement communities also explicitly acknowledges "entrance fees." See G. L. c. 93, § 76 (a) (defining entrance fee as "an initial or deferred transfer to a provider of a sum of money or other property made or promised to be made as full or partial consideration for acceptance of a specified individual as a resident in a facility"). At a hearing on the motion to dismiss, however, the defendant conceded that it is not a continuing care retirement community. Nor has either party, or the amici, provided us with briefing on the issue. Accordingly, we decline to consider the permissibility of upfront charges in continuing care retirement communities.

regulations define an administrative fee as "[a]ny charge billed to and payable by a Resident as a condition of admission, excluding room, board, and services."  Id.  The initial assessment activities that ALRs are mandated to conduct are unquestionably conditions of admission, and the regulatory definition recognizes that charges may be imposed for such activities, which fall outside the purview of regular monthly charges for room, board, and ongoing services.  As the EOEA is the agency charged with administering the ALR statute, its interpretation of the statute is entitled to deference.  See Camargo's Case, 479 Mass. 492, 497 (2018) ("In matters of statutory interpretation, deference is due when an agency interprets a statute it is charged with administering" [quotation and citation omitted]).  Thus, the fact that the EOEA contemplated that initial fees may be charged in accordance with G. L. c. 19D, § 13, further demonstrates that such charges are permissible.

In summary, we conclude that the significant differences between ALRs and residential landlords, combined with the explicit language of the statute and the EOEA's interpretation thereof, indicate a legislative intent to allow ALRs to charge incoming residents initial fees that correspond to initial ALR-specific services inapplicable to ordinary landlord-tenant relationships, without violating the security deposit statute.

e. <u>Permissibility of the community fee</u>.  We turn now to the specific allegations advanced in the instant case.  To determine whether the community fee was charged in violation of the security deposit statute, it is necessary to examine both the purpose for which the fee was imposed as well as the specific way in which the fee was used.  To be permissible, the purpose and the use of the community fee must correspond to either the on-boarding services enumerated in G. L. c. 19D, § 13, or other services designed specifically for ALRs.  In other words, the permissibility of the community fee will hinge on a determination of (1) the actual purpose and use of the fee, and (2) whether such purpose and use are for distinctive ALR-specific services, rather than general maintenance or other aspects of a generic residential tenancy.

The plaintiff's complaint does not specify whether the community fee was used to charge solely for initial assessment services distinctive to the ALR.  The residency agreement, which both sides agree is applicable and should be considered in connection with the motion to dismiss, see note 5, <u>supra</u>, indicates that the community fee was directed toward "upfront staff administrative costs, the Resident's initial service coordination plan and move-in assistance, and [to] establish a replacement reserve for building improvements."  Of the four categories listed, the first three appear to pertain to

distinctive entry services provided by the ALRs.  Pursuant to our analysis supra, imposing the community fee for such purposes would appear to be permissible.[18]  In the instant case, however, the residency agreement indicates that the community fee is not limited to providing initial ALR-specific services.  The last category, which refers to establishing a replacement reserve for building improvements, appears much more open ended and potentially problematic.  It is unclear from the language in the residency agreement whether, and to what extent, this building reserve fund was used toward ALR-specific services, rather than generic building maintenance.  If this fee were just a generic building maintenance fee, imposed and used in the ordinary course, with no particular connection to structures, services, or requirements distinct to ALRs, it would fall afoul of the security deposit prohibitions applicable to the landlord-tenant relationship.  Given the breadth of the language in the plaintiff's residency agreement, and the uncertainty with which it applies, the motion to dismiss should not have been allowed.

---

[18] Given the vagueness of the agreement and the complaint, and our conclusion that the motion to dismiss cannot be granted regarding the fourth component, we need not, however, definitively address this issue and decline to do so here.

At a minimum, factual development of the purpose and use of the building maintenance fee was required.[19]

3. <u>Conclusion</u>.  For the foregoing reasons, we reverse the allowance of the defendant's motion to dismiss.  We remand the matter to the Superior Court for further proceedings consistent with this opinion.

<u>So ordered</u>.

---

[19] Whether the community fee was, in fact, charged for each of the purposes listed in the residency agreement, or only a subset, is also a question of fact that cannot be resolved on the record before the court on a motion to dismiss.