438 Mass. 739 (2003)                                          739

School Committee of Newton *v.* Newton School Custodians Association, Local 454, SEIU.

SCHOOL COMMITTEE OF NEWTON *VS.* NEWTON SCHOOL
CUSTODIANS ASSOCIATION, LOCAL 454, SEIU.[1]

Middlesex. November 7, 2002. - February 28, 2003.

Present: MARSHALL, C.J., GREANEY, COWIN, SOSMAN, & CORDY, JJ.

*Arbitration,* Authority of arbitrator, Collective bargaining, School committee,
Discretion of arbitrator. *School and School Committee,* School principal,
Collective bargaining, Appointment of personnel, Cafeteria worker. *Education Reform Act.*

Discussion of the hiring authority of school principals pursuant to G. L. c. 71,
§ 59B, and the authority of school committees to enter into collective
bargaining agreements. [745-751]
This court concluded that an arbitrator had jurisdiction to decide whether a
city's school committee had violated certain provisions of a collective
bargaining agreement concerning the filling of a school's open position for
cafeteria manager; however, in ordering the principal of the school and the
school committee to offer a particular applicant the cafeteria manager posi-
tion and to make her whole for an initial failure to offer her the position,
the arbitrator went beyond the boundaries of his jurisdiction by substituting
his discretion for that of the school principal, in contravention of G. L.
c. 71, § 59B. [751-752]

CIVIL ACTION commenced in the Superior Court Department on
March 14, 2001.

The case was heard by *S. Jane Haggerty,* J., on a motion for
judgment on the pleadings.

The Supreme Judicial Court on its own initiative transferred
the case from the Appeals Court.

[1]We acknowledge the amicus brief of the Massachusetts AFL-CIO; Mas-
sachusetts Teachers' Association; Massachusetts Federation of Teachers;
Service Employees International Union; American Federation of State, County,
and Municipal Employees, Council 93; Massachusetts Laborers' District
Council; SEIU Local 3, National Conference of Firemen & Oilers; SEIU Lo-
cal 285; SEIU Local 509; United Food and Commercial Workers Union, Lo-
cal 1495; and United Food and Commercial Workers Union, Local 328 (union
amici). We also acknowledge the amicus brief of the Massachusetts Associa-
tion of School Committees, and the amicus brief of the Massachusetts As-
sociation of School Superintendents.

*James F. Lamond* for the defendant.

*Michael C. Loughran (Daniel C. Brown* with him) for the plaintiff.

The following submitted briefs for amici curiae:

*Mary T. Sullivan, Donald J. Siegel, Ann Clarke, Judith Neumann, & Jeffrey W. Jacobsen* for Massachusetts AFL-CIO & others.

*Michael J. Long* for Massachusetts Association of School Superintendents.

*Stephen J. Finnegan* for Massachusetts Association of School Committees.

MARSHALL, C.J. Acting pursuant to G. L. c. 150C, § 11, a Superior Court judge vacated the award of an arbitrator finding that the school committee of Newton (school committee) had violated the terms of a collective bargaining agreement (agreement). The arbitrator had ordered the school committee to offer to an unsuccessful candidate the position of cafeteria manager in a Newton school. The judge ruled that the arbitrator exceeded the limits of his authority by usurping the rights of the school's principal under G. L. c. 71, § 59B, to hire all school personnel.[2] See G. L. c. 150C, § 11 (*a*) (3).[3] The union appealed, and we transferred the case to this court on our own motion.

We must first determine whether the arbitrator had jurisdiction to decide whether the school committee had violated certain provisions of the agreement concerning the filling of open positions and, if so, whether G. L. c. 71, § 59B, precluded the

---

[2]General Laws c. 71, § 59B, states in pertinent part: "Principals employed under this section shall be the education administrators and managers of their schools and shall supervise the operation and management of their schools and school property, subject to the supervision and direction of the superintendent. Principals employed under this section shall be responsible, consistent with district personnel policies and budgetary restrictions and subject to the approval of the superintendent, for hiring all teachers, athletic coaches, instructional or administrative aides, and other personnel assigned to the school, and for terminating all such personnel subject to review and prior approval by the superintendent and subject to the provisions of this chapter."

[3]General Laws c. 150C, § 11 (*a*), states, in pertinent part: "Upon application of a party, the superior court shall vacate an award if: . . . (3) the arbitrators exceeded their powers or rendered an award requiring a person to commit an act or engage in conduct prohibited by state or federal law."

remedy ordered by the arbitrator. For the reasons discussed below, we conclude that the arbitrator did have authority to determine whether the school committee had violated the agreement, but that the remedy he fashioned impermissibly infringed on the statutory hiring prerogatives of the school principal. We vacate the judge's order and that portion of the arbitrator's award relating to remedies.

1. *Background.* We summarize the facts found by the arbitrator. During the relevant time period, the school committee, as the exclusive bargaining agent for the Newton school district, see G. L. c. 150E, § 1, was party to an agreement with "the Nutrition Workers Unit" of the Newton School Custodians Association, Local 454, Service Employees International Union (union).[4] The union was the exclusive collective bargaining agent for cafeteria managers, food truck drivers, cooks, and cafeteria helpers in the Newton school district. Article IX, § 4, of the agreement establishes certain criteria to be considered when filling new or vacant[5] positions, as follows:

> "When the [school] [c]ommittee plans to fill vacancies in existing positions or when new positions are established, it is the intention of the [a]dministration to fill such positions after consideration of the following factors:
>
> a. Length of service from date of original permanent appointment in classification.
>
> b. Knowledge, training, ability, skill and efficiency.
>
> c. Physical fitness.
>
> d. Leadership qualities."[6]

---

[4] The agreement identified "the union" as the Newton school nutrition workers unit of Local 454, Service Employees International Union. The precise relationship between that entity, "Nutrition Workers Unit," and the named defendant in this action is not clear from the record.

[5] Article IX, § 1, of the agreement defines a vacancy as "a new position or an opening in an existing position (which is to be filled at the discretion of the [school] [c]ommittee) caused by promotion, death, retirement, resignation, permanent transfer, or discharge."

[6] "Administration" is not defined in the agreement. From the parties' and the arbitrator's use of the term, we understand "administration" to refer to the

Under art. IX, § 5, seniority prevails when, in the principal's judgment, the other qualifications listed in art. IX, § 4, are equal among candidates.[7] The agreement also sets out procedures for the resolution of any "grievance or dispute" that "may arise between the parties involving only the application, meaning, or interpretation of the [a]greement." It provides that grievances or disputes not settled at the administrative level through procedures established in the agreement may be submitted by either party to "final and binding" arbitration.

In 1999, there was a vacancy in the position of cafeteria manager at Newton South High School. A vacancy notice was posted in accordance with procedures set out in the agreement. Five individuals, all of whom were members of the union, applied for the position. Linda Cloonan, the grievant, was among them. At the time, Cloonan was employed as a school cook. Four of the applicants, including Cloonan, were interviewed for the position by Jeanne Sheridan, the director of food services, and her production assistant, Jeanne Johnson. Sheridan and Johnson were employed by Chartwells Division of the Compass Group USA, Inc., a private company contracted by the school committee to manage the school district's cafeteria services. Sheridan had asked for and obtained permission from Michael Pierce, the school committee's manager of support services, to have "substantial input" in the hiring process because the cafeteria manager position was important to running the school's cafeteria operation. In agreeing to give Sheridan an active role in the hiring process, Pierce told her that the school's principal, Roberta Dollase, would need to be "actively involved in the decisional process."[8] Sheridan and Pierce also discussed the qualification factors established by art. IX of the agreement.

In addition to the interviews of the four candidates she selected, Sheridan also spoke with Cloonan's direct supervisor,

---

entity in charge of the hiring of cafeteria employees subject to this agreement. Here, under the Reform Act, that is the principal, subject to the approval of the superintendent. See G. L. c. 71, § 59B.

[7]Article IX, § 5, of the agreement provides that, "[w]here b, c, and d, in [§] 4 above, are equal in the judgment of the Administration, the length of service from the original date of appointment shall govern."

[8]The arbitrator stated, "Sheridan could not recall more precisely whether Pierce said the principal would need only to give input into the decision, or would need to make the final decision."

a cafeteria manager, who was strongly supportive of Cloonan's candidacy.[9] Sheridan concluded that Cloonan and two of the other applicants were viable candidates. Although she preferred one candidate (not Cloonan) who had some management experience in food services, Sheridan felt that any of the candidates she chose could handle the job well. Sheridan passed the names of the three candidates on to Heidi Black, Dollase's administrative assistant, and informed Black which candidate she preferred. Sheridan did not share with Black any of the information she had learned from Cloonan's supervisor.

At Dollase's direction, Black interviewed all three candidates. Because the Newton South High School cafeteria had been having problems with staff motivation and had experienced increasing demands on employees due to a shortened student lunch period, Black was determined to find and to recommend to Dollase the candidate demonstrating the strongest leadership ability. In separate interviews, she asked each candidate the same set of questions that she had drawn up to evaluate each candidate's leadership skills. The arbitrator stated that "Black candidly acknowledged that beyond assessing leadership only from their interview answers, she did not attempt to compare the three candidates regarding knowledge, training, ability, skill and efficiency, nor did she compare their seniority." Black did not review the candidates' resumes, job evaluations, or references. She "assumed" that all three candidates were equally qualified in all respects other than leadership ability because Sheridan had presented all three as viable candidates. Black "unequivocally" recommended one candidate to Dollase. That person was not Cloonan, nor was she Sheridan's preferred candidate. The arbitrator found that "Dollase simply accepted Black's recommendation; she conducted no independent evaluation of the candidates."

---

[9]The arbitrator noted: "Cafeteria Manager Scena [Cloonan's supervisor] stated that Cloonan had filled in as manager during his absences, and done well in that role of acting cafeteria manager. Scena [also] informed Sheridan that [Cloonan] met the criteria of being able to communicate effectively, both verbally and in writing, with students, staff, administration, and parents; and of using appropriate customer service techniques. Scena also told Sheridan that [Cloonan] met the criterion of 'demonstrated supervisory skills.' In sum, Scena told Sheridan that he strongly supported [Cloonan's] application to become the cafeteria manager at Newton South High."

The union filed a grievance on Cloonan's behalf, claiming that the school committee had violated the provisions of art. IX of the agreement when it refused to offer Cloonan the cafeteria manager position.[10] When the dispute could not be resolved at the administrative level, the union and Cloonan submitted the grievance to binding arbitration in accordance with the dispute resolution terms of the agreement.

The union presented the following issue to the arbitrator: "Did the Employer violate Article IX of the collective bargaining agreement in the appointment of a cafeteria manager at Newton South High School? If so, what shall be the remedy?" The school committee sought to add a threshold question: "Is the grievance substantially arbitrable?" The union took the position that it would consent to arbitrate the school committee's issue only if the parties agreed that the arbitrator's decision on the matter was final and binding. The school committee, determined to preserve the arbitrability question for court review, refused. The arbitrator then proceeded solely on the issue raised by the union.

After determining that Cloonan had greater seniority than the successful applicant, see note 10, *supra*, the arbitrator concluded, in relevant part, that the "[e]mployer"[11] violated the provisions of art. IX of the agreement by failing to make a reasonably well-informed, good-faith judgment about the candidates' relative abilities. Specifically, he determined that

---

[10]Cloonan alleged that there were violations of art. IX, §§ 4, 5, and 6, of the agreement. Section 6 provides: "If an employee has bid and is to be passed on the seniority roster through the filling of the vacancy by an employee lower down on such seniority roster or by others, the employee passed shall be notified of that fact and the reasons therefore [*sic*] in writing with a copy sent to the Union."

The arbitrator determined that Cloonan had been a cook fifty-six days longer than the successful applicant, although both were certified as cooks on the same day, March 1, 1999. The union claimed, and the arbitrator agreed, that Cloonan's certification would have occurred eight weeks prior had the school committee submitted the paper work in a timely manner. Both applicants were certified as cafeteria helpers on the same day, March 2, 1995.

[11]"Employer" is not defined in the agreement. For purposes of collective bargaining, G. L. c. 150E, § 1, defines the "school committee" as the "employer." The arbitrator, however, uses "employer" when referring to (1) the school committee; (2) the "[a]dministration," as used in the agreement, see note 6, *supra*; and (3) the hiring decision maker.

Black, the effective decision maker, had acted in an "arbitrary and capricious" manner by failing to apply the factors listed in art. IX, § 4, and by failing to take reasonable steps to assess the candidates' relative leadership abilities. He determined that the appropriate remedy was to order that Cloonan be offered the position of cafeteria manager and otherwise to "make her whole" by paying her back salary with interest and granting her benefits and seniority as if she had been hired as the school's cafeteria manager in March, 1999.

The school committee filed a complaint in the Superior Court pursuant to G. L. c. 150C, § 11 (*a*) (3), to vacate the arbitral award on the ground that it unlawfully usurped the principal's "exclusive managerial powers" under G. L. c. 71, § 59B. The union answered and counterclaimed for judicial confirmation of the award. See G. L. c. 150C, § 10. The judge allowed the school committee's motion for judgment on the pleadings. She held that the arbitrator had exceeded his authority by ordering that Cloonan be offered the cafeteria manager position because, contrary to the findings of the arbitrator, the judge found that Sheridan and Johnson, under Dollase's direction, had fully evaluated the art. IX, § 4, criteria, and because G. L. c. 71, § 59B, authorized Dollase to decide on a successful candidate based only on Black's assessment of the applicants' leadership qualities.

2. *Analysis.* We have today reiterated the circumscribed scope of review applicable to challenges to arbitration. See *School Comm. of Pittsfield* v. *United Educators of Pittsfield, post* 753, 758-759 (2003). Those standards are controlling here.

Resolution of this case turns on whether the provisions of the agreement that establish procedures for filling nonprofessional school positions address a matter within the school committee's discretion that may properly be the subject of collective bargaining, or whether they concern a matter within the school principal's discretion that cannot be contracted away. *Id.* The school committee claims that art. IX, § 4, of the agreement unlawfully usurps a principal's discretion under G. L. c. 71, § 59B, to choose individuals to fill available positions in a school. In essence, it asserts that § 59B, as rewritten by the Reform Act of 1993 (Reform Act), St. 1993, c. 71, § 53, shifts

from the school committee to the principal the sole authority to establish the qualifications for positions at the principal's school. We disagree.

We begin by examining the hiring authority of school principals pursuant to G. L. c. 71, § 59B. In *School Comm. of Pittsfield* v. *United Educators of Pittsfield, supra,* we concluded that, in crafting the Reform Act, the Legislature sought to improve the quality of public school education in the Commonwealth, in large measure by instituting a system of school-based management. Under that system, school principals are strictly accountable for the educational performance of their schools, see G. L. c. 69, § 1J, inserted by St. 1993, c. 71, § 29,[12] and they may be immediately dismissed if their schools are determined by the board of education to be "chronically underperforming." See *id.* Accompanying the greater accountability of school principals is enhanced management authority over the day-to-day management of their schools. G. L. c. 71, § 59B, as appearing in St. 1993, c. 71, § 53.[13] This enhanced managerial authority includes the power, formerly reserved to the school committees, to hire, discipline, and terminate teachers and other school personnel.[14]

However, while the Reform Act granted public school

[12]See G. L. c. 69, § 1, which declares the Commonwealth's intent to ensure "(1) that each public school classroom provides the conditions for all pupils to engage fully in learning as an inherently meaningful and enjoyable activity without threats to their security or self-esteem, (2) a consistent commitment of resources sufficient to provide a high quality public education to every child, (3) a deliberate process for establishing and achieving specific educational performance goals for every child, and (4) an effective mechanism for monitoring progress toward those goals and for holding educators accountable for their achievement."

[13]A 1994 amendment (St. 1994, c. 60, § 95) pertaining to principals of schools that require examination for admission is not relevant here. In 1996, § 59B was further amended to give principals authority over hiring athletic coaches. St. 1996, c. 134, § 2.

[14]The parties do not contest that G. L. c. 71, § 59B, authorizes a public school principal to hire the school's cafeteria manager. There is, however, a threshold question whether the position at issue here involved not a hiring decision within the meaning of § 59B, but a redeployment of staff among current employees of the school system. Section 59B mandates that the principal "shall" be responsible for hiring "personnel assigned to the school." As we state in *School Comm. of Pittsfield* v. *United Educators of Pittsfield, post* 753, 763 (2003), quoting *School Comm. of Lowell* v. *Local 159, Serv. Employees Int'l*

principals new management authority over personnel within their respective schools, such power was carefully cabined. Except in the case of "chronically under-performing" schools, see G. L. c. 69, § 1J, the Legislature declined to accord principals the power to hire, discipline, or terminate individuals without the approval of the superintendent. See *School Comm. of Pittsfield* v. *United Educators of Pittsfield, supra* at 760. The Legislature also subordinated the principals' hiring authority to the school committees' exclusive prerogatives to set school budgets and to promulgate "district personnel policies." G. L. c. 71, § 59B.[15] In other words, the Reform Act gives principals broad discretion to determine, among other things, whom to hire from a pool of available applicants, but it leaves intact the authority of the school committee, subject to standards established by the Board of Education, to determine the minimum qualifications, and hence the permissible pool, of applicants.

The authority of a school committee to control district-wide personnel policy necessarily encompasses the prerogative, if the school committee so chooses, to establish procedures for carrying out its personnel policies. Our courts, both before and after passage of the Reform Act, have consistently held that such personnel-related procedures may properly be open to collective bargaining, and that the bargained-for procedure will be enforced so long as it does not result in an abdication of the school committee's, or a principal's, core statutory authority.

---

*Union,* 42 Mass. App. Ct. 690, 692 (1997), "while the statute does not define the word 'hire,' the term must be 'given its ordinary meaning, "employ." ' " Were we to adopt the classification of employees that the union amici urge, the principal's authority to control hiring of all "personnel assigned to the school" would be impermissibly narrowed. See *School Comm. of Lowell* v. *Local 159, Serv. Employees Int'l Union, supra* (applying § 59B to dispute concerning bid of school custodian to transfer to another school).

[15]The Reform Act further clarified the lines of accountability for school performance by vesting school committees with the authority to hire superintendents, see G. L. c. 71, § 37, as appearing in St. 1993, c. 71, § 35, who in turn have the authority to hire principals, see G. L. c. 71, § 59B, as appearing in St. 1993, c. 71, § 53, and by making the school committee itself answerable to the Legislature for district-wide performance. Under the Reform Act, under-performing districts are subject to a number of sanctions, including the appointment of a receiver. See G. L. c. 69, § 1K, inserted by St. 1993, c. 71, § 29.

See, e.g., *Blue Hills Regional Dist. Sch. Comm.* v. *Flight,* 383 Mass. 642, 643 (1981) ("collective bargaining agreement provided explicitly that appointments would be made without regard to sex, and . . . that provision was arbitrable"); *Boston Teachers Union, Local 66* v. *Boston,* 370 Mass. 455, 462 (1976) ("the provision for the hiring of substitute teachers was a proper subject of collective bargaining"); *School Comm. of Peabody* v. *Peabody Fed'n of Teachers, Local 1289,* 51 Mass. App. Ct. 909, 911 (2001) ("This decision is not to be interpreted as invalidating collective bargaining provisions that establish procedures for applying for transfers and filling vacancies that do not encroach upon the powers to approve or disapprove reserved to principals and superintendents by G. L. c. 71, § 59B"); *School Comm. of Lowell* v. *Labor Relations Comm'n,* 46 Mass. App. Ct. 921, 921 (1999) (Reform Act "did not abrogate collective bargaining agreements with school committees insofar as the agreements concerned terms and conditions of employment or procedures for making appointments, as opposed to decisions about hiring or firing designated categories of school employees"); *School Comm. of Lowell* v. *Local 159, Serv. Employees Int'l Union,* 42 Mass. App. Ct. 690, 693 (1997) ("We do not perceive the procedures for filling vacancies to infringe upon the powers of the principal and superintendent so long as they retain the right of approval of the employee selected pursuant to those procedures").

   The provisions of art. IX that are at issue here do not encroach on a school principal's managerial control over hiring. Consistent with G. L. c. 71, § 59B, art. IX of the agreement does not remove from the principal the actual, first-line determination of whom to hire. Far from dictating the choice of a certain individual, art. IX merely establishes the "intention" of each "[a]dministration" (in this case, the school principal) to "consider[]" at least four factors before filling a vacancy. Three of these factors ("[k]nowledge, training, ability, skill and efficiency"; "[p]hysical fitness"; and "[l]eadership qualities") are highly subjective. The fourth factor, "[l]ength of service," concerns an employment status whose benefits have long been a subject of collective bargaining in matters between the public employers and employees. See *School Comm. of Lowell* v. *Lo-*

*cal 159, Serv. Employees Int'l Union, supra* at 693 (refusing to invalidate provisions of collective bargaining agreement establishing process for filling vacancies by bidding and seniority, "so long as the prior approval which was vested in the school committee rests now with the principal and superintendent"). Moreover, art. IX does not purport to restrict the principal's review to only the four listed factors, or to require the principal to assign any certain weight to those factors. Under the agreement, for instance, the principal remains free to minimize the importance of seniority in considering employee qualifications, although the principal is required to put her reasons for doing so in writing. At most, the contested provisions of art. IX require the principal to make a good-faith effort to evaluate a job applicant's qualifications in four enumerated areas, and to resort to seniority if the principal independently determines that the candidates stand on identical footing with respect to the other more subjective criteria. The intrusion on the principal's hiring discretion is minimal and well within the school committee's statutory authority over "district personnel policies." G. L. c. 71, § 59B.

Our conclusion is consistent with other statutes concerning the authority of school committees to enter into collective bargaining agreements.[16] See *PGR Mgt. Co., Heath Props.* v. *Credle*, 427 Mass. 636, 640 (1998) (courts "construe statutes to give reasonable effect to all the statutory provisions and create a consistent body of law"). The Legislature has expressly mandated school committees to negotiate in "good faith" with their employees' representatives on matters concerning "wages, hours, standards [of] productivity and performance, and any other terms and conditions of employment." G. L. c. 150E, § 6. The phrase "terms and conditions of employment" is general and broad, and must be determined "on a case by case basis." *Burlington* v. *Labor Relations Comm'n*, 390 Mass. 157, 164 (1983).

The Legislature has also authorized a school committee to enter into binding arbitration to settle disputes relating to the

---

[16]The Legislature may define what matters are proper subjects for collective bargaining. See *Boston Teachers Union, Local 66* v. *School Comm. of Boston*, 370 Mass. 455, 464 n.5 (1976).

provisions of a collective bargaining agreement. In particular, G. L. c. 150E, § 8, provides in pertinent part: "The parties may include in any written agreement a grievance procedure culminating in final and binding arbitration to be invoked in the event of any dispute concerning the interpretation or application of such written agreement. . . . Where binding arbitration is provided under the terms of a collective bargaining agreement as a means of resolving grievances concerning job abolition, demotion, promotion, layoff, recall, or appointment and where an employee elects such binding arbitration as the method of resolution under said collective bargaining agreement, such binding arbitration shall be the exclusive procedure for resolving any such grievance *notwithstanding any contrary provisions of sections thirty-seven, thirty-eight . . . and section fifty-nine B of chapter seventy-one*" (emphasis added). The phrase italicized was added by St. 1988, c. 186, § 1, and was left undisturbed by the Reform Act, which did amend G. L. c. 150E, § 1. See St. 1993, c. 71, § 62.

The union contends that the provisions of G. L. c. 150E, § 8, cited above control the arbitrability issue in this case and provide a substantive right to collective bargaining over matters of job appointments.[17] That position is difficult to reconcile with the plain language of G. L. c. 150E, § 8, which merely permits the parties to elect binding arbitration of certain issues, including job appointments, but by its plain terms does not require that result. *Salem Hosp.* v. *Rate Setting Comm'n*, 26 Mass. App. Ct. 323, 325 (1988) ("The distinction in statutes between 'shall,' a word of command, and 'may,' a word of permission, is not one which courts pass over lightly unless context or other provisions require it"). See G. L. c. 150E, § 6 (employer's obligation to bargain in good faith "shall not compel either party to agree to a proposal or make a concession"). The union amici's position is also difficult to reconcile with G. L. c. 150E, § 7, which enumerates statutory provisions that *must* be overridden when in conflict with a collective bargaining agreement but makes no mention of G. L. c. 71, § 59B. We must presume

---

[17]The argument was raised first by the union amici and adopted by the union at oral argument. See *National Ass'n of Gov't Employees* v. *Commonwealth*, 419 Mass. 448, 454 n.12 (1995).

that when the Legislature acts to truncate a school committee's authority, it does so explicitly. See *School Comm. of Danvers* v. *Tyman*, 372 Mass. 106, 113 (1977) ("Whenever the Legislature has limited the powers of school committees, it has done so in express terms, and it is expected that a radical departure from prior policy would be clearly indicated, and not left to doubtful implication").[18] It is not inconsistent that the Legislature granted individual principals certain authority over personnel *selection* under G. L. c. 71, § 59B, while at the same time preserving the right of school committees to elect to resolve issues related to personnel procedures by final and binding arbitration. In the absence of explicit legislative commands to the contrary, we construe statutes to harmonize and not to undercut each other.

The facts before us are not unlike those in *School Comm. of Peabody* v. *Peabody Fed'n of Teachers, Local 1289*, 51 Mass. App. Ct. 909 (2001), and *School Comm. of Lowell* v. *Local 159, Serv. Employees Int'l Union*, 42 Mass. App. Ct. 690 (1997). In each case, the court concluded that an arbitration award could not usurp a principal's hiring authority under § 59B, but in each case, the court was also careful to state that the school committee retained the authority to establish procedures for implementing personnel policies that may be submitted to collective bargaining. See *School Comm. of Pittsfield* v. *United Educators of Pittsfield, post* 753, 762-763 (2003).

Nevertheless, although the arbitrator did not exceed his authority in considering the union's grievance, in ordering the principal and the school committee to offer Cloonan the cafeteria manager position and to "make her whole" for the initial failure

[18]Similarly, we reject the school committee's argument that, because G. L. c. 150E, § 7, does not list G. L. c. 71, § 59B, among the statutory provisions whose terms must be overridden by collective bargaining agreements, the Legislature intended that no feature of a principal's hiring practices can ever be the subject of collective bargaining. We presume that, at the time it enacted G. L. c. 71, § 59B, "the Legislature was cognizant that the school committee remained the exclusive bargaining agent for the school district," *School Comm. of Lowell* v. *Local 159, Serv. Employees Int'l Union*, 42 Mass. App. Ct. 690, 693 (1997). While it is true that collective bargaining agreements may not diminish a principal's managerial authority under § 59B, it is equally true that a principal's managerial authority under § 59B must not diminish the school committee's authority over "district personnel policies," including the authority to bargain over the terms and conditions of employment uniformly across the district.

to offer her the position, he went beyond the boundaries of his jurisdiction. While an arbitrator enjoys considerable latitude in fashioning an award, see *Old Rochester Regional Teacher's Club* v. *Old Rochester Regional Sch. Dist. Comm.*, 398 Mass. 695, 701 (1986), he may not fashion an award that contravenes existing law or requires others to transgress existing law. See *Plymouth-Carver Regional Sch. Dist.* v. *J. Farmer & Co.*, 407 Mass. 1006, 1007 (1990). We agree with the judge that the arbitrator's order that Cloonan be offered the cafeteria manager position in effect substituted the arbitrator's discretion for that of the school principal, in contravention of § 59B. See *School Comm. of Lowell* v. *Local 159, Serv. Employees Int'l Union, supra*; *School Comm. of Peabody* v. *Peabody Fed'n of Teachers, Local 1289, supra*.

3. *Conclusion.* For the foregoing reasons, the judge's order is vacated.[19] On remand, an order is to enter in the Superior Court remanding the case to the arbitrator for further proceedings consistent with this opinion.

*So ordered.*

---

[19]To the extent the judge reviewed the arbitrator's factual findings and substituted her own, this was impermissible. See *Lynn* v. *Thompson*, 435 Mass. 54, 61-62 (2001), and cases cited.