NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-13726

JAMES M. RYAN, executor,[1],[2] vs. MARY ANN MORSE HEALTHCARE CORP.[3]


Middlesex.      November 5, 2025. - March 13, 2026.

Present:  Budd, C.J., Gaziano, Kafker, Wendlandt, Georges,
Dewar, & Wolohojian, JJ.


Assisted Living Residence.  Landlord and Tenant, Security
    deposit.  Consumer Protection Act, Landlord and tenant,
    Availability of remedy, Class action.  Practice, Civil,
    Summary judgment, Class action.



    Civil action commenced in the Superior Court Department on
August 24, 2016.

    Following review by this court, 483 Mass. 612 (2019), the
case was heard by Maureen Mulligan, J., on motions for summary
judgment, and entry of judgment was ordered by Brent A. Tingle,
J.

    The Supreme Judicial Court granted an application for
direct appellate review.

_____

    [1] Of the estate of Julia W. Ryan.

    [2] Individually and on behalf of all others similarly
situated.

    [3] Doing business as Heritage at Framingham.

AiVi Nguyen (Brian J. Edmonds also present) for the defendant.
Joshua N. Garick (Matthew T. LaMothe also present) for the plaintiff.
The following submitted briefs for amici curiae:
Kevin W. Buono for Massachusetts Assisted Living Association.
Andrea Joy Campbell, Attorney General, & Andrew C. Musgrave, Assistant Attorney General, for the Attorney General.
Mark A. Aronsson, Derek M. Gillis, & Kevin W. Buono for Tewksbury Living Group, LLC, & others.
Sam Wehrle & Kelly Bagby, of the District of Columbia, Eric Carlson, of California, Lindsay Mitnik, John J. Ford, Richard M.W. Bauer, Liane Zeitz, & Stuart T. Rossman for AARP & others.

DEWAR, J.  We return in this appeal to the application of the security deposit statute, G. L. c. 186, § 15B, to fees charged by an assisted living residence (ALR).  We first considered the application of the security deposit statute to ALRs in Ryan v. Mary Ann Morse Healthcare Corp., 483 Mass. 612 (2019) (Ryan I).  That appeal followed the dismissal of the class action complaint in this case alleging that the defendant ALR violated the security deposit statute and thereby also violated G. L. c. 93A.  The complaint challenged the defendant's practice of charging incoming residents a "community fee" that the complaint alleged did not fall within the four categories of fees an incoming tenant may be charged under G. L. c. 186, § 15B (1) (b).  The judge dismissed the complaint on the ground that the security deposit statute was entirely inapplicable to ALRs, which are subject to their own regulatory scheme set forth in the ALR statute, G. L. c. 19D.

In Ryan I, 483 Mass. at 622-628, we concluded that the security deposit statute and ALR statute could be read in harmony to effectuate the Legislature's purposes in both statutes.  We held that the security deposit statute does apply to ALRs as lessors of residential property, see id. at 622-623, but does not restrict ALRs when they "charge incoming residents initial fees that correspond to initial ALR-specific services inapplicable to ordinary landlord-tenant relationships," id. at 628.

Based on the limited record before us in Ryan I, 483 Mass. at 613-614, we reversed the order dismissing the complaint and remanded the case to the Superior Court for further factual development regarding whether the disputed community fee corresponded to ALR-specific intake services.  Following discovery and certification of a plaintiff class, the parties each moved for summary judgment.  A Superior Court judge allowed the plaintiffs' motion and denied the defendant's motion, and the defendant appealed.  Before this court, the parties both contend that there are no genuine issues of material fact, and that they each are entitled to summary judgment.

We conclude that the defendant is entitled to judgment as a matter of law based on uncontradicted evidence in the record establishing that the community fees charged by the defendant correspond to the defendant's provision of ALR-specific intake

services to the members of the plaintiff class.  We therefore reverse the judge's order as to both motions for summary judgment and remand the case to the Superior Court for entry of judgment in favor of the defendant.[4]

Background.  1.  Facts.  The following facts are undisputed.  We reserve certain details for later discussion.

The defendant, Mary Ann Morse Healthcare Corp. (defendant), operates an assisted living residence called Heritage at Framingham (Heritage).  The defendant also operates a nursing home in Natick and offers home care services.

As we described in greater detail in Ryan I, 483 Mass. at 617-619, assisted living residences are "part of the spectrum of living alternatives for the elderly in the commonwealth," St. 1994, c. 354, § 1.  ALRs do not provide their residents with the extensive medical care available at nursing homes but do provide personal services to assist residents with activities of daily living.  See Ryan I, supra at 618, citing G. L. c. 19D, §§ 1, 10, 16.  To qualify as an ALR, a facility must be able to

---

[4] We acknowledge the amicus briefs submitted by the Massachusetts Assisted Living Association; the Attorney General; Tewksbury Living Group, LLC, Meridian Senior Living, LLC, Esplanade Capital LLC, and EC Tewksbury LLC; and AARP, AARP Foundation, the National Consumer Law Center, the National Academy of Elder Law Attorneys, Dignity Alliance Massachusetts, Justice in Aging, and the Massachusetts Chapter of the National Academy of Elder Law Attorneys.

assist its residents with activities such as bathing, dressing, and ambulation.  See G. L. c. 19D, § 10 (a) (2).

ALRs' provision of these services is governed by statute under G. L. c. 19D and regulations promulgated by the Executive Office of Aging and Independence.[5]  ALRs are required to conduct initial screenings of potential residents to assess whether the ALR is able to meet each resident's needs.  651 Code Mass. Regs. § 12.04(6) (2024).  If the ALR determines that it is able to meet the person's needs and the person chooses to enter the ALR as a resident, the ALR must prepare an individualized service plan that describes "the needs of the resident for personal services and the providers, or intended providers thereof, and the frequency and duration of such services."  G. L. c. 19D, § 12 (a).  See also G. L. c. 19D, § 2 (v) (requirement to provide services in accordance with service plan); 651 Code Mass. Regs. § 12.04(8)(a)(2) (service plan must "address the [r]esident's particular physical, cognitive, psychological and social needs").  The service plan must be developed before the resident moves into the facility.  651 Code Mass. Regs. § 12.04(7).

---

[5] This agency, charged with implementing the ALR statute, see G. L. c. 19D, §§ 1, 19, was formerly known as the Executive Office of Elder Affairs, see Ryan I, 483 Mass. at 619, 628; St. 2024, c. 392, § 97 (name change effective Jan. 9, 2025).

Heritage accordingly has a screening and application process for people interested in becoming ALR residents. At the outset, Heritage's community relations director fields inquiries from prospective residents and their family members. During the preliminary screening phase that follows, Heritage gathers basic information about the prospective resident, including the person's needs, and shares information about the programs and services available at Heritage. The community relations director typically arranges a tour of Heritage's facility and meetings with members of Heritage's staff for prospective residents and their family members. For some prospective residents, this preliminary screening process involves multiple tours and conversations.

If a prospective resident moves forward with the application process after the preliminary screening, Heritage solicits medical documentation from the prospective resident's physician and requires the prospective resident to provide information on an application form. Heritage then conducts an in-person clinical screening. At this step, Heritage evaluates the applicant's physical and mental capacities, examines the applicant's medical record, and confers with the applicant's physician regarding any questions, all with the ultimate purpose of assessing whether Heritage would be suitable for the applicant. This clinical screening is conducted by Heritage's

resident care director or, if the care director is unavailable, by a nurse. If the prospective resident is applying for one of Heritage's specialized programs focused on mental health or memory impairment, the director of the relevant program also may participate.

Following the clinical screening, if Heritage determines that it cannot meet the needs of a prospective resident, it will decline the application and refer the person to the defendant's nursing home or to other facilities that better suit the person's needs. If accepting the application, Heritage creates an individualized service plan for the new resident. A nurse completes this task under the supervision of the resident care director, based on information provided by the resident and in consultation with Heritage's activities and dietary departments.

When a resident moves in, Heritage completes an additional series of tasks. A nurse conducts another clinical assessment, and the resident and the resident's family meet with various members of staff, including the activities department to discuss recreational opportunities and the dietary department to review dietary restrictions and food preferences. Staff members also may provide assistance with moving in the resident's furniture and other belongings and installing adaptive equipment. And, in the week or so after a resident moves in, the various department

heads at Heritage each are expected to visit the new resident to welcome and orient the new resident to Heritage.

After this lawsuit commenced, the defendant performed an estimate of its payroll costs attributable to paying staff to perform these components of the intake process for each year of the class period. Heritage's then-executive director spoke with employees involved with the intake process, discussed their roles and the amount of their time spent on the process, and reviewed some of their job descriptions. The defendant then estimated the percentage of each employee's time spent on the intake process on either an annual or per admission basis and, using the number of new admissions and employee salaries paid for each year of the class period, calculated its total payroll costs. The defendant's resulting estimated payroll costs for the intake process ranged from approximately $131,000 to $188,000 each year from 2012 to 2020.[6] While the plaintiffs dispute the significance of these estimates for reasons we reserve for our discussion, the plaintiffs have not presented evidence disputing the accuracy of the estimates.

---

[6] For 2021 and 2022, the record contains updated salary information for the relevant employees and the number of new admissions each year, but no calculation by the defendant of its total annual payroll costs for the intake process. The plaintiffs make no argument that these figures differ materially from prior years.

Heritage enters into a "residency agreement" with each new resident, a copy of which is required to be included for agency approval in Heritage's biennial submission for certification renewal as an ALR. See 651 Code Mass. Regs. § 12.03(2)(f)(8); 651 Code Mass. Regs. § 12.03(7). Among other things, the agreement enumerates the services to be provided by Heritage, the other responsibilities and duties of Heritage, and the resident's rights, responsibilities, and financial obligations. Among such obligations, Heritage requires each new resident to pay the last month's rent upon executing the residency agreement. The agreement acknowledges that Heritage must pay the resident annual interest on the last month's rent under the security deposit statute, G. L. c. 186, § 15B (2) (a).

Of most significance here, Heritage also requires new residents to pay a one-time "community fee." The residency agreement describes this fee as "intended to cover [(1)] upfront staff administrative costs, [(2)] the [r]esident's initial service coordination plan[,] and [(3)] move-in assistance, and [(4)] establish a replacement reserve for building improvements."[7] Under Heritage's policies for administering this

_____

[7] In the trial court, the defendant disputed that this contract language remained the same throughout the class period and asserted that the residency agreement was revised following the commencement of this lawsuit. No alternate version of the contract is included in the record before this court, however,

fee, Heritage provides a partial refund of the fee to residents who move out within 180 days; charges only one such fee to spouses who move in together; and does not charge this fee to prospective residents who begin the intake process but ultimately do not move in. In setting the amount of this fee, Heritage reviewed market studies of analogous fees charged by other ALRs, and Heritage typically increased the amount of the fee by three percent each year.

Julia Ryan entered into a residency agreement with Heritage and became a new resident of the ALR in 2013. Her monthly rent was $4,000, and she paid a one-time community fee of $2,800. Consistent with the typical intake process at Heritage described above, Heritage gathered her medical documentation, conducted a clinical screening, created a service plan for her, performed another clinical assessment when she moved in, collected her dietary information, and held a series of orientation meetings for her with various staff members.

From the start of the class period in 2012 to January 10, 2023, newly admitted residents to Heritage like Ryan paid a total of 288 one-time community fees, ranging from $1,500 to $3,400. Excluding fees that were later refunded, Heritage

---

and the defendant also took the position below that its revision to this language in the agreement did not create a genuine issue of material fact. We accordingly discuss the only agreement before the court.

collected a net total of $951,225 in community fees. The amount of community fees that Heritage collected in a single year during this period ranged from a low of $48,200 for the new admissions in 2016 to $134,280 in 2022. For each year in the record for which there are total annual cost estimates, see note 6, supra, the defendant's estimated payroll costs for the intake process exceeded the total amount of community fees collected.

Heritage deposited all the community fee proceeds, along with other sources of revenue such as the residents' monthly rent payments, into its general operating account. Heritage used its general operating account to pay for various expenses, including capital improvements that do not relate to ALR-specific intake services. The defendant concedes that, because it does not segregate the community fees charged by Heritage into a separate bank account or otherwise independently account for them, it cannot trace how each specific dollar of each community fee was spent.

2. Procedural history. In 2016, the personal representative of Ryan's estate filed a class action complaint in the Superior Court against the defendant, claiming violations of G. L. c. 186, § 15B, and G. L. c. 93A. The complaint alleged, in essence, that Heritage's community fee was unlawful because it violated the security deposit statute, and charging the fee therefore was unfair and deceptive under G. L. c. 93A.

See G. L. c. 186, § 15B (1) (b) (prior to commencement of tenancy, lessor may charge tenant only first month's rent, last month's rent, security deposit equal to first month's rent, and purchase and installation cost for key and lock); 904 Code Mass. Regs. § 3.17(4)(a) (2020) (charging tenant fee beyond four permissible categories enumerated in c. 186, § 15B [1] [b], is unfair or deceptive practice).

In response, the defendant filed a motion to dismiss, arguing that the security deposit statute does not apply to ALRs.  The defendant's motion was allowed, and we transferred the named plaintiff's appeal to this court to address whether ALRs are subject to the requirements of the security deposit statute.

Following briefing and oral argument, we concluded that the security deposit statute applies to ALRs to the extent that an ALR resembles a traditional lessor, but the statute does not restrict ALRs when they are charging "additional upfront fees for the distinct services that such facilities provide that are not applicable to ordinary landlord-tenant relationships."  Ryan I, 483 Mass. at 622.  "To be permissible," we held, "the purpose and the use of [a] . . . fee must correspond to either the on-boarding services enumerated in G. L. c. 19D, § 13, or other services designed specifically for ALRs."  Id. at 629.  Parsing the language in Heritage's residency agreement describing the

community fee, we noted that the first three categories listed in the description -- "upfront staff administrative costs, the [r]esident's initial service coordination plan[,] and move-in assistance" -- "appear[ed]" to be permissible. Id. The fourth category, however -- for "establish[ing] a replacement reserve for building improvements" -- "appear[ed]" to be "potentially problematic." Id. Accordingly, we reversed the allowance of the defendant's motion to dismiss and remanded for further factual development. Id. at 630.

On remand, following discovery and certification of a plaintiff class of "[a]ll current and former residents of Heritage at Framingham who paid a '[c]ommunity [f]ee' from August 24, 2012[,] to the present," all parties moved for summary judgment. After a hearing, a judge allowed the plaintiffs' motion as to Heritage's liability and denied the defendant's motion. The motion judge reasoned that, because the bank account into which Heritage deposited all community fees was a general account used to pay for various expenses including generic capital improvements not related to the provision of ALR-specific intake services, "[t]he plaintiffs [had] demonstrated as a matter of law that Heritage does not actually use the [c]ommunity [f]ees solely for distinctive ALR-related services." The judge concluded that the defendant thus violated the security deposit statute by charging a fee in excess of the

four permissible categories under G. L. c. 186, § 15B (1) (b), and thereby also violated G. L. c. 93A.

After cross motions regarding the assessment of damages and a nonevidentiary hearing, a different Superior Court judge awarded the plaintiff class the $951,225 in unrefunded community fees collected by Heritage over the class period. The judge declined, however, to order treble damages, concluding that the damages-trebling provisions of the security deposit statute were inapplicable to these circumstances, and that the defendant's violation of the security deposit statute was not willful or knowing under G. L. c. 93A. In total, the defendant was ordered to pay $2,648,409.47, including $913,509.88 in prejudgment interest and $783,674.59 in attorney's fees and costs.

The defendant timely appealed, and we allowed its application for direct appellate review.

Discussion. Where the parties cross-moved for summary judgment, each arguing for judgment as a matter of law based on undisputed facts in the record, we review the judge's decision de novo. See Boston Globe Media Partners, LLC v. Department of Criminal Justice Info. Servs., 484 Mass. 279, 286 (2020). For each motion, we determine whether the moving party is entitled to judgment as a matter of law after viewing the evidence in the light most favorable to the opposing party and drawing all permissible inferences and resolving any evidentiary conflicts

in the opposing party's favor.  See Nguyen v. Massachusetts Inst. of Tech., 479 Mass. 436, 448 (2018), citing Cabot Corp. v. AVX Corp., 448 Mass. 629, 636-637 (2007).  Where the opposing party will bear the burden of proof at trial, "[a] moving party may satisfy its burden [on summary judgment] 'either by submitting evidence that negates an essential element of the opposing party's case or by demonstrating that the opposing party has no reasonable expectation of proving an essential element of [its] case at trial.'"  Tody's Serv., Inc. v. Liberty Mut. Ins. Co., 496 Mass. 197, 199 (2025), quoting Hill-Junious v. UTP Realty, LLC, 492 Mass. 667, 672 (2023).  "Once this burden is met, the opposing party must set forth specific facts demonstrating a genuine issue for trial."  Tody's Serv., Inc., supra, at 199-200, citing Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991), and Mass. R. Civ. P. 56 (e), 365 Mass. 824 (1974).

The defendant argues that it is entitled to summary judgment that it did not violate the security deposit statute under Ryan I, 483 Mass. at 629, based on uncontradicted evidence in the record that Heritage provided ALR-specific intake services to the members of the plaintiff class, and that Heritage incurred costs in providing those services that exceeded the amount of the "community fees" it collected under the residency agreement to "cover" (1) "upfront staff

administrative costs," (2) "the [r]esident's initial service coordination plan," and (3) "move-in assistance." With respect to the fourth category the fee was intended to cover under the contract, to "establish a replacement reserve for building improvements," the defendant acknowledges that the record shows that the general operating account into which Heritage deposited the community fees was used to pay for generic capital expenditures not related to ALR-specific services, among other expenses. But the defendant contends that Heritage was not required to segregate the collected community fees into a separate account, and that where Heritage undisputedly provided permissible ALR-specific intake services pursuant to the first three categories in the contract, at a cost greater than the amount of upfront fees collected, the defendant is entitled to judgment as a matter of law, regardless of Heritage's generic capital expenditures from its general operating account.

The plaintiffs counter that the judge's allowance of their summary judgment motion was proper because, for a host of reasons, the defendant cannot show that the "actual purpose and use of the [community] fee," Ryan I, 483 Mass. at 629, was for ALR-specific intake services. Based on Heritage's commingling of the collected fees with other funds in a general operating account used to pay for generic capital expenditures, the plaintiffs argue that the record undisputedly shows that the

fees were not used for ALR-specific intake services; rather, the fees were used as the "reserve for building improvements" referenced in the residency agreement, to pay for the kind of impermissible generic expenses for which a lessor may not charge tenants an upfront fee under the security deposit statute. They further argue that the defendant's "post hoc" calculation of Heritage's costs to provide intake services, undertaken during this litigation, cannot show the fee's actual purpose and use, and that various other facts show that the community fee had "nothing to do with" providing ALR-specific intake services. Instead, they contend, the community fee was a "junk fee" simply intended to extract as much money from new residents as possible.

We agree with the defendant that, on the record before us, the defendant is entitled to judgment as a matter of law that it did not violate the security deposit statute, because Heritage's community fee "correspond[ed] to either the on-boarding services enumerated in G. L. c. 19D, § 13, or other services designed specifically for ALRs." Ryan I, 483 Mass. at 629.

It is undisputed that new residents of Heritage paid the community fee when they executed residency agreements with Heritage providing that the fee was intended to cover, in part, "upfront staff administrative costs, the [r]esident's initial service coordination plan[,] and move-in assistance." We noted

in Ryan I, 483 Mass. at 629, that these first three categories of the community fee "appear[ed] to be permissible," and the plaintiffs have not argued or pointed to evidence that the three categories set forth in the contract do not, in fact, encompass ALR-specific intake services of the kind that an ALR may charge under Ryan I without violating the security deposit statute.[8]

And the record developed on remand now shows without contradiction that Heritage in fact did furnish a host of ALR-specific intake services requiring administrative coordination, create service plans for new residents, and provide move-in assistance. Indeed, the plaintiffs do not dispute that Heritage maintains an intake process involving preliminary screenings to determine whether Heritage is a suitable fit for potential residents, tours of the ALR's facilities and meetings with ALR staff, consultation with prospective residents' physicians, application paperwork, clinical assessments, creation of service plans, and assistance with moving new residents' furniture and

---

[8] While not disputing that the three categories encompass ALR-specific services, the plaintiffs do state in passing that the residency agreement "did not mention salaries as either the purpose of or the use of the '[c]ommunity [f]ees.'" To the extent this statement is an argument that the labor costs of providing ALR-specific services fall outside "staff administrative costs" and costs to "cover . . . the [r]esident's initial service coordination plan and move-in assistance," the argument is undeveloped entirely. We therefore decline to consider it.

installing adaptive equipment.[9]  And the plaintiffs have not made any argument that these various components of Heritage's intake process are not ALR-specific services.  Cf. G. L. c. 19D, § 13 (1) (ALRs to provide "opportunity to apply for assisted living residence services, and be informed about the eligibility requirements and the resident's rights and obligations under the program"); G. L. c. 19D, § 13 (2) (requirement to provide "initial pre-screening assessment conducted for the purposes of determining eligibility for and need of assisted living services"); G. L. c. 19D, § 12 (a) (required service coordination plan); 651 Code Mass. Regs. § 12.04(6) (required initial screening).

The defendant also has presented evidence, again uncontradicted by the plaintiffs, that Heritage incurred payroll

---

[9] The plaintiffs have not created a triable issue of fact as to whether, notwithstanding the express terms of the residency agreement and Heritage's undisputed provision of various intake services, Heritage in fact did not charge the fee for these services, based on deposition testimony from Heritage's president that "[t]here are no charges when we provide a tour" or "when [Heritage does] these initial phone calls or meet[ings] with staff to see if it's a good placement" and that Heritage does not charge an "application fee," nor impose any charges for gathering "medical documentation," for the initial "clinical assessment . . . of the [applicant's] current medical state," for "the service coordination plan," for "redo[ing] the service plan" if "there's a change in clinical status for a resident," or for "move-in assistance."  In context, the only reasonable understanding of this testimony is that Heritage does not charge for each of these services at the time the service is rendered, as the witness specified in response to the initial questions in this lengthy series.

costs to provide these ALR-specific intake services that exceed the total amount in community fees collected. In depositions pursuant to Mass. R. Civ. P. 30 (b) (6), as appearing in 489 Mass. 1401 (2022), current and former Heritage employees testified regarding the roles of the community relations director, resident care director, and other employees in the intake process for new residents. Heritage's controller and its former executive director then described how Heritage's payroll costs attributable to this intake process were estimated for each year of the class period, based on each employee's role in the intake process, the percentage of the employee's time spent on intake tasks, and the employee's salary for the year. While the plaintiffs' brief asserts that "[d]efense counsel simply invented percentages of various individuals' salaries that could be attributable to various on-boarding tasks," they do not cite to any record evidence contradicting the defendant's evidence regarding either the amount of the payroll costs Heritage incurred to provide the specified intake services or the manner in which the defendant went about calculating those costs.[10]

---

[10] In the Superior Court, the plaintiffs requested that the defendant's motion for summary judgment be stayed under rule 56 (f) "to the extent that the court believes [evidence of time each staff member spent on intake tasks] to be material." See Mass. R. Civ. P. 56 (f), 365 Mass. 824 (1974) (where party opposing summary judgment "cannot for reasons stated present by affidavit facts essential to justify his opposition, the court

On this record, the defendant is entitled to summary judgment that its collection of the community fee did not violate the security deposit law. The required degree of "correspond[ence]" between an upfront ALR fee and the provision of ALR-specific intake services, Ryan I, 483 Mass. at 628, is reached when the ALR did provide ALR-specific intake services of kinds the fee stated it was intended to cover and the ALR's costs in providing such services exceed the fees collected for them. In such circumstances, no more extensive inquiry into "the actual purpose and use of the fee" is required. Id. at 629. As we recognized in Ryan I, id. at 627, the Legislature "explicitly permit[ted] upfront charges that pertain to initial resident assessments" when it enacted the ALR statute, in

---

may . . . order a continuance to permit" further discovery "or may make such other order as is just"). The basis for the plaintiffs' motion, which is included in the defendant's record appendix, was that the defendant had objected on privilege grounds to the deposition of its counsel and other discovery concerning any role counsel played in creating the "post hoc" estimate of Heritage's payroll costs for providing ALR-specific intake services. Defense counsel responded that the plaintiffs instead should seek the information from Heritage or other witnesses. The plaintiffs subsequently questioned the defendant's rule 30 (b) (6) deponents regarding how the calculations were performed; in these depositions, defense counsel did not object to questions concerning how the percentages were calculated, nor was any privilege invoked; and the witnesses identified by name various current or former Heritage employees who performed roles in the intake process over the course of the class period. The plaintiffs' brief on appeal does not mention the rule 56 (f) motion, let alone argue that more discovery is needed.

furtherance of the statute's stated purpose to promote the availability of ALRs and the services they provide, see St. 1994, c. 354, § 1.  Holding that an ALR nonetheless may be liable under the security deposit statute for charging a fee for ALR-specific intake services that the ALR provided, where the fee does not even cover the ALR's costs in providing the services, risks detracting from the Legislature's aim to encourage the provision of these services.  See Ryan I, supra at 620, quoting School Comm. of Newton v. Newton Sch. Custodians Ass'n, Local 454, SEIU, 438 Mass. 739, 751 (2003) ("In the absence of explicit legislative commands to the contrary, we construe statutes to harmonize and not to undercut each other").

We thus conclude that the defendant is entitled to summary judgment notwithstanding that the residency agreement states that the community fee was intended in part to cover what remains a "problematic" fourth category of costs, Ryan I, 483 Mass. at 629, the "establish[ment of] a replacement reserve for building improvements," and notwithstanding that Heritage used the same general operating account into which Heritage deposited the collected community fees (as well as residents' monthly rent and fees) to pay for generic capital expenditures among other

expenses.[11]  This evidence does not compel judgment in favor of the plaintiffs or create a triable issue of fact in the circumstances of this case for two reasons.

First, the fact that Heritage undisputedly cannot trace its expenditure of each dollar of community fees collected and therefore cannot show that no dollar raised through the fee was spent on generic capital expenditures does not amount to a violation of the security deposit statute.  Contrary to the plaintiffs' argument, the security deposit statute contains no provision requiring ALRs to segregate funds raised through upfront fees for ALR-specific services, nor does it require that an ALR be able to trace the expenditure of each dollar it receives in such fees.  As the plaintiffs emphasize, the security deposit statute does require a lessor to take various measures with respect to tenants' security deposits and payments for the last month's rent, such as paying the tenants interest, keeping the security deposits in a separate interest-bearing

---

[11] The defendant characterizes the evidence regarding Heritage's use of its operating account as demonstrating that Heritage never "establish[ed]" a separate "replacement reserve" fund "for building improvements" pursuant to the fourth category of the residency agreement.  There is evidence in the record of a "routine capital reserve" line item in Heritage's capital budgets, however.  Because we draw reasonable inferences in favor of the plaintiffs when considering the defendant's motion for summary judgment, we infer that Heritage did in fact use its general operating account in part as a "reserve" for capital expenditures.

account, and providing tenants with an itemized list of any damages and associated cost of repairs deducted from a security deposit.  See G. L. c. 186, § 15B (2) (a), (3) (a)-(b), (4) (iii).  But these provisions do not apply to upfront fees for ALR-specific intake services, which are neither security deposits nor payments for the last month's rent.  The security deposit statute thus does not require segregation or prohibit commingling of fees collected for ALR-specific services.[12]

Second, and relatedly, in the particular circumstances here, the existence of generic capital expenditures from the general operating account into which Heritage deposited the fees does not create a triable issue of fact as to whether the community fee actually "correspond[ed]" to the provision of ALR-specific intake services.  As we have discussed, the record shows without contradiction that Heritage in fact did provide

---

[12] Nor does any such requirement arise from the ALR statute or implementing regulations brought to our attention by the plaintiffs.  The plaintiffs assert that segregation of fees for ALR-specific intake services is required by language in the ALR statute permitting services to "be offered . . . on a fee for service basis," G. L. c. 19D, § 13, and the regulation requiring ALRs to provide "[a] clear explanation of the services included in any fees, a description and itemization of all other bundled services as well as an explanation of other services available at an additional charge," 651 Code Mass. Regs. § 12.08(2)(a)(9).  The plaintiffs' assertion has no apparent grounding in the plain language of these provisions, which, as relevant here, simply permit the charging of, and require a clear and itemized explanation of, certain fees -- without stating any restrictions on how an ALR must segregate funds raised through the fees.

ALR-specific services of kinds the residency agreement states the fee was intended to cover, and the cost of providing those intake services exceeded the amount of fees collected. This degree of "correspond[ence]" is, for the reasons discussed, sufficient to avoid liability under the security deposit statute.[13]

For similar reasons, we are unpersuaded by the plaintiffs' other arguments in favor of affirmance of summary judgment in their favor. In short, the plaintiffs argue that undisputed facts show that Heritage did not charge the community fee for the purpose of providing ALR-specific intake services, because the amount of the fee was decoupled from the actual costs of providing the services. Chief among various arguments to this effect, the plaintiffs argue that, although the defendant has shown that Heritage provided various intake services to new residents and incurred costs in doing so, the defendant has not

---

[13] The plaintiffs argue that Heritage nonetheless is liable under the security deposit statute because the language of the residency agreement -- which is submitted for agency approval as part of the ALR certification process -- violates a regulation requiring ALRs to provide "[a] clear explanation of the services included in any fees, a description and itemization of all other bundled services as well as an explanation of other services available at an additional charge." 651 Code Mass. Regs. § 12.08(2)(a)(9). Just as the problematic fourth category in the residency agreement is immaterial in the circumstances of this case, so too is any alleged lack of particularity in the contract's language.

shown that it set the community fee based directly on a calculation of the costs of providing the services; rather, the plaintiffs object, the defendant's calculation of its costs was performed only "post hoc," during this litigation.[14]

We agree with the plaintiffs that an ALR cannot belatedly fabricate a purported correspondence between an upfront fee and permissible ALR-specific intake services when such a correspondence did not exist at the time that the fee was charged. Here, however, as discussed above, the ALR-specific services that Heritage provided fell within categories that the residency agreement executed at the same time the fee was charged stated the fee was intended to cover, and it is undisputed that Heritage incurred costs in providing these

---

[14] In a similar vein, the plaintiffs argue that (a) Heritage, rather than performing an assessment of its own costs of providing ALR-specific intake services in setting the fee, instead relied on "industry survey studies" to determine how much it could reasonably charge; (b) Heritage did not alter the amount of the community fee based on changes over time in its costs of providing ALR-specific services; (c) Heritage charges only a partial community fee when a resident leaves within 180 days of moving in and does not charge any fee, despite rendering ALR-specific services, when a prospective resident is the spouse of an existing resident or chooses not to move into Heritage after beginning the intake process; (d) the "payroll for the individuals who purportedly performed these services dwarfed the amount of the collected [fees]"; and (e) starting in July 2020, the defendant consolidated Heritage's payroll with the payroll for the defendant's nursing home and paid both businesses' payrolls out of an account associated with the nursing home rather than from the general operating account into which the community fees were deposited.

services exceeding the amount of the fees collected.  We hold today that such evidence is sufficient to show that the fee "correspond[s] to initial ALR-specific services inapplicable to ordinary landlord-tenant relationships."  Ryan I, 483 Mass. at 628.  Accordingly, other evidence regarding the relationship between the amount of the fee and Heritage's costs, and the manner in which the fee was set, see note 14, supra, is not material in the circumstances of this case.

Moreover, we reject the plaintiffs' suggestion that the amount of an ALR's upfront fee for ALR-specific intake services must mirror the ALR's costs exactly.  Although the security deposit statute limits a lessor to charging for "the purchase and installation cost for a key and lock" (emphasis added), G. L. c. 186, § 15B (1) (b) (iv), the statute contains no analogous requirement with respect to fees charged by ALRs for ALR-specific services that would limit an ALR to charging only for its actual costs in providing ALR-specific services.  Thus, while an ALR's upfront fees are permissible under the security deposit statute only if the fee "correspond[s] to initial ALR-specific services inapplicable to ordinary landlord-tenant relationships," Ryan I, 483 Mass. at 628, the security deposit statute imposes no further requirement that the amount of the

fee be the exact amount of the ALR's costs in providing the services.[15]

In so holding, we recognize that the plaintiffs' arguments relate to important questions of public policy, "which, of course, the Legislature is free to address" (citation omitted). 21 Merchants Row Corp. v. Merchants Row, Inc., 412 Mass. 204, 207 (1992). We ourselves are limited to interpreting, and attempting to harmonize and give effect to, the statutes the Legislature has enacted. See Ryan I, 483 Mass. at 622.

Conclusion. We reverse the order granting the plaintiffs' motion for summary judgment and denying the defendant's motion for summary judgment and remand the case for entry of judgment in favor of the defendant.

So ordered.

---

[15] Likewise, nothing in the security deposit statute prohibits ALRs from charging community fees based on average costs -- rather than the costs incurred in connection with the intake of each individual resident -- to which the plaintiffs object in passing. While we reject the plaintiffs' various arguments to the effect that the amount of the fee must mirror exactly the ALR's costs of providing services, we need not reach in this case, and express no view on, circumstances in which an ALR collects upfront fees in amounts exceeding its costs of providing the ALR-specific intake services.